IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

VICTOR SOLORIO CASTELAN,

        Petitioner,

vs.

ROSANNE CAMPBELL, ET AL.,

        Respondents.

No. 2:06-cv-01906-MMM

<u>ORDER DENYING
PETITION FOR WRIT OF
HABEAS CORPUS</u>

    Victor Castelan is a California state prisoner, serving a twenty-years-to-life sentence for second-degree murder with the use of a firearm. He filed a 28 U.S.C. § 2254 habeas petition to challenge his initial parole denial by the Board of Prison Terms ("the Board"), renamed Board of Parole Hearings, on due process grounds. Because the Board's decision is supported by "some evidence" of Castelan's current dangerousness to the community, his primary due process challenge to his

parole denial fails. See Hayward v. Marshall, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc). Castelan's other procedural due process challenges to his parole denial also cannot be sustained.

## BACKGROUND

In 1993, Castelan pled guilty to the second-degree murder of Antonio Rocha, as well as a five-year enhancement for using a firearm in the commission of a crime. Ans. at 1; Ex. 1; Ex. 2 at 14-15. Castelan was sentenced to twenty years to life. Ans. at 1; Ans. Ex. 1. The victim, Rocha, was driving when another vehicle pulled alongside of his car and began firing shots. Rocha sustained multiple gunshot wounds to the head and face. He was pronounced dead on arrival at the hospital.

An anonymous caller identified the suspect's vehicle as a red Chevy Impala. The police stopped the vehicle and found Rudy Torres and Angel Borg inside. Both Torres and Borg admitted to being involved in the shooting and identified Castelan, who was sixteen at the time, as the shooter. Ans. Ex. 2 at 14-17. According to Castelan, Rocha appeared to be reaching for a weapon before Castelan shot at the car four times. Ans. Ex. 2 at 18. Castelan, Torres, and Borg assumed that Rocha and Gomez were members of a rival gang because of the colors they were wearing. Ans. Ex. 3 at 4. At the parole hearing, Deputy District

1  Attorney Hoyt stated that, in his opinion, there was no indication that the victim
2  was a gang member. Ans. Ex. 2 at 47.

3  Castelan appeared at his initial parole hearing in October 2004. Ans. Ex. 2
4  at 56. The Board found that Castelan posed "an unreasonable risk of danger to
5  society or a threat to public safety" and denied parole for three years. Ans. Ex. 2 at
6  56, 59. The Board based its decision on a number of factors, including the nature
7  of the offense, the lack of motive for the crime, Castelan's lengthy criminal history,
8  his failed previous grants of juvenile probation, his unstable family and social
9  relationships, and his prison disciplinary record. Ans. Ex. 2 at 56-61. The Board's
10 decision became final on February 11, 2005. Ans. Ex. 2 at 62.

11 Castelan filed a state habeas petition challenging his parole denial in San
12 Joaquin County Superior Court. The Superior Court denied the petition on June 3,
13 2005, finding that the Board's decision was supported by "some evidence" and that
14 Castelan's due process rights were not otherwise violated. Ans. Ex. 3 at 2-5. The
15 California Court of Appeal summarily denied Castelan's petition on September 15,
16 2005, Ans. Ex. 4, and the California Supreme Court denied Castelan's petition on
17 July 12, 2006. Ans. Ex. 5.

18                          **STANDARD OF REVIEW**

19 Under the look-through doctrine, the California Supreme Court's summary

denial is presumed to rest on the same grounds as the Superior Court's decision. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991). Castelan is in custody pursuant to a state court adjudication and filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Pet. at 1. Under AEDPA, a district court can grant habeas relief only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d); see also Hayward, 603 F.3d at 563. The "unreasonable application" standard is "highly deferential," Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997), requiring that the writ issue only where the state court's application of federal law was "objectively unreasonable," and not merely incorrect. Williams v. Taylor, 529 U.S. 362, 409-11 (2000). A state court's factual findings are presumed to be correct unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## ANALYSIS

### I. WHETHER CASTELAN'S PAROLE DENIAL IS SUPPORTED BY "SOME EVIDENCE" (CLAIM 3)

#### A. HAYWARD V. MARSHALL

Castelan argues that the Board's finding that he is unsuitable for parole is not supported by the evidence and thus violates his due process rights. Pet. at 6; Memo at 16. In Hayward v. Marshall, the Ninth Circuit recently established the framework for federal habeas review of California state parole decisions. 603 F.3d at 562-63. The court held that "in the absence of state law establishing otherwise, there is no federal constitutional requirement that parole be granted in the absence of 'some evidence' of future dangerousness or anything else." Id. at 561. However, the court invoked two decisions by the California Supreme Court—In re Lawrence, 190 P.3d 535 (Cal. 2008), and In re Shaputis, 190 P.3d 573 (Cal. 2008)—holding, as a matter of state constitutional law, that "'some evidence' of future dangerousness is required for a denial of parole in California." Hayward, 603 F.3d at 562. The court held that federal district courts adjudicating the habeas claims of California inmates must accordingly "decide whether the [parole denial] was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the

1  evidence.'" Id. at 563 (quoting 28 U.S.C. § 2254(d)(1) & (d)(2)).

2  Ninth Circuit decisions applying Hayward have clarified its holding as an elaboration of federal constitutional law. In Pearson v. Muntz, the court explained that "state-created rights may give rise to liberty interests that may be enforced as a matter of federal law." 606 F.3d 606, 609 (9th Cir. 2010); accord Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010). "By holding that a federal habeas court may review the reasonableness of the state court's application of the California 'some evidence' rule, Hayward necessarily held that compliance with the state requirement is mandated by federal law, specifically the Due Process Clause." Pearson, 606 F.3d at 609. In other words, in requiring habeas courts to review parole denials for compliance with California's "some evidence" rule, Hayward holds that California state constitutional law creates a cognizable interest in parole absent "some evidence" of dangerousness, and that the federal Due Process Clause in turn incorporates that right as a matter of clearly established federal law. Accordingly, the following analysis considers, under Hayward, whether the Board's decision constituted an unreasonable application of the "some evidence" rule.

### B. WHETHER CASTELLAN'S PAROLE DENIAL WAS SUPPORTED BY "SOME EVIDENCE"

The Board based its parole denial on several grounds. First, the Board found that Castelan's offense was carried out in an "especially cruel and callous manner." Ans. Ex. 2 at 56. According to the Board, "it was basically a drive by shooting," involving multiple victims and "was carried out in a manner . . . very close to what we would call an execution style murder." Ans. Ex. 2 at 56-57. In the Board's view, the "motive for the crime was inexplicable" and "showed a total disregard for another human being, for human life." Ans. Ex. 2 at 56. In addition, Castelan "had a very lengthy criminal history," and an "escalating pattern of criminal conduct," Ans. Ex. 2 at 20, 56-57, and "failed previous grants of juvenile probation." "[S]ociety's previous attempts to correct [Castellan's] criminality" failed. Ans. Ex. 2 at 57. The Board also found that Castelan had a history of unstable, tumultuous relationships, and interactions with his family, Ans. Ex. 2 at 57-58, and only "programmed in a limited manner while incarcerated." Ans. Ex. 2 at 57. Finally, the Board cited disciplinary infractions for possession of alcohol and the failure to report to work assignments. Ans. Ex. 2 at 57-58.

On the positive side, the Board noted that Castelan's recent psychological evaluation showed that he was on the right track and making progress. Ans. Ex. 2

at 58. According to the evaluator, Dr. Greenstone, Castelan's "level of dangerousness in a structured environment [if released to the community] [was] . . . below average" compared to other inmates. Ans. Ex. 2 at 34, 58. Castelan earned his high school credentials by passing the General Educational Development ("GED") tests and obtained numerous vocational welding certificates. Ans. Ex. 2 at 31-32, 59. Castellan participated in several self-help programs and earned a certificate of completion in Criminals and Gangs Anonymous (a twelve-step program similar to Alcoholics Anonymous). Ans. Ex. 2 at 29-30. Castelan also had "acceptable parole plans," Ans. Ex. 2 at 58—namely, two residential offers and two job offers, both for welding. Ans. Ex. 2 at 38-39. Nonetheless, the Board found these positive factors insufficient to outweigh the factors supporting Castelan's unsuitability for parole. Ans. Ex. 2 at 59.

### 1. Nature of the offense

The record supports the Board's finding that Castelan's offense, "basically a drive by shooting," was "especially cruel, . . . callous," and "showed a total disregard for . . . human life." Ans. Ex. 2 at 56. Although Castelan reargues his defenses and disputes facts concerning the crime, it was hardly unreasonable for the Board to characterize the drive-by shooting in this manner.

However, in In re Lawrence, the California Supreme Court explained that "a

particularly egregious commitment offense" does not categorically justify a parole denial in the absence of a finding of current dangerousness. 190 P.3d at 539.

> [T]he aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

Id. at 555. Here, the state court erroneously concluded that the finding as to the "especially heinous, atrocious, and cruel manner" of the offense "alone was sufficient to determine petitioner unsuitable for parole." Ans. Ex. 3 at 5. Nonetheless, the opinion as a whole acknowledged the Board's finding of Castellan's current dangerousness and the factors linking Castellan's commitment offense to the risk he poses to the community.

### 2. Lengthy criminal history and failed grants of juvenile parole

The Board identified Castelan's "lengthy criminal history," "escalating pattern of criminal conduct," and "failed previous grants of juvenile probation" as factors supporting Castelan's unsuitability for parole. Ans. Ex. 2. at 56-57. Castelan has a lengthy juvenile record, which includes twenty-eight contacts with the juvenile justice system, ranging from petty theft and running away from a

9

group home to possession of stolen property and possession of a firearm. Ans. Ex. 2. at 47-49, 57.

Under California law, a previous record of violence is a factor tending to indicate unsuitability for parole. The California statute requires that the parole panel consider a prisoner's "past criminal history," without specifying *violent* criminal history, in determining parole suitability. Cal. Code Regs. tit. 15 § 2402(b). In several cases predating In re Lawrence, the California Court of Appeal determined that a history specifically of "violent crimes is not required for a finding of parole unsuitability" and that the Board may base a determination of unsuitability at least in part on a prisoner's non-violent criminal history. In re Bettencourt, 156 Cal. App. 4th 780, 803-05 (Cal. Ct. App. 2007); see also In re Fuentes, 135 Cal. App. 4th 152, 163-64 (Cal. Ct. App. 2005); In re Roderick, 154 Cal. App. 4th 242, 276-78, modified and reh'g den., No. A113370 Cal. App. LEXIS 1525 (Cal. Ct. App. 2007).[1]

---

[1] The California Supreme Court in In re Lawrence referenced In re Bettencourt and In re Fuentes as cases that erroneously focused the inquiry of "some evidence" solely on whether there existed "some evidence of an unsuitability factor" rather than "some evidence" of current dangerousness. 190 P.3d at 1215 n.14. In re Lawrence did not criticize either In re Bettencourt or In re Fuentes as to their construction of the unsuitability factors, but rather only for failing to evaluate current dangerousness. See id. Thus, a prisoner's history of non-violent crime can support a denial of parole, but the ultimately inquiry must still determine whether there is "some evidence" of current dangerousness

1   In particular, a prisoner's history of non-violent crimes can demonstrate the
2   "repetitive and recidivist nature of [an inmate's] conduct." In re Fuentes, 135 Cal.
3   App. 4th at 163. In both In re Bettencourt and In re Fuentes, the California Court
4   of Appeal concluded based on a prior non-violent criminal record that the prisoner
5   failed to "heed wake-up calls" and respond to "opportunities to reform his
6   conduct" and thus that there was "some evidence" of parole unsuitability. In re
7   Fuentes, 135 Cal. App. 4th at 163; In re Bettencourt, 156 Cal. App. 4th at 803-04.
8   Castelan's "failed previous grants of juvenile probation," his twenty-eight contacts
9   with the juvenile justice system, and "escalating pattern of criminal conduct," Ans.
10  Ex. 2 at 57, similarly showed his history of failing to follow rules and take
11  advantage of opportunities to reform his conduct. See Ans. Ex. 2 at 57. Castelan's
12  criminal history and recidivism thus constitute "some evidence" to support the
13  Board's determination of his current dangerousness and unsuitability for parole.

14   **3.   History of unstable relationships**

15   The Board also found that Castelan had a history of unstable social
16  relationships and family interactions and gang ties. Ans. Ex. 2 at 57-58. Although
17  this issue is close, the evidence is insufficient to support the Board's finding of
18  current dangerousness. As the California Supreme Court explained, "due

---

justifying the denial of parole.

11

consideration of the specified factors [for parole suitability] requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." In re Lawrence, 190 P.3d at 552 (internal quotation marks omitted). Reliance on immutable factors, like a history of unstable relationships, is justified "*only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety." Id. at 560. The "some evidence" requirement is "unquestionably deferential, but certainly is not toothless." Id. at 552.

No rational nexus links Castelan's rebellious childhood relationship with his mother and his father and their previous acts of abandonment to Castelan's current dangerousness. At most the Board found that Castelan's unstable social past paved the way for the offense in question and his other juvenile offenses. Ans. Ex. 2 at 47-48, 57-58. The record shows that Castelan has repaired the relationship with his mother, with whom he plans to live upon his release, and established a strong relationship with his younger sister. Pet. Ex. H at 60. Although his father is in contact with his mother, he does not currently live with Castelan's mother, and thus is unlikely to affect the stability of Castelan's home environment in the future. Ans. Ex. 2 at 36-37.

Castelan was a member of a gang, and this membership was directly related to his crime. Ans. Ex. 2 at 19, 28. However, Castelan also participated in a twelve-step recovery program in Criminal and Gangs Anonymous, Ans. Ex. 2 at 28-29, and testified that he was no longer part of a gang and never joined a prison gang. Ans. Ex. 2 at 20. The record contains a laudatory statement from a floor officer that he witnessed Castelan advising his sister how to stay away from gang life and raise her child and that, in his opinion, Castellan showed "tremendous growth." Ans. Ex. 2 at 36. Castelan has no history of violent behavior while incarcerated. Ans. Ex. 2 at 33. The Board did not find, nor do Castelan's institutional evaluations suggest, that Castelan is at risk for joining a gang once released. Although this is a closer call, as Castelan's gang membership was directly related to the crime, the facts regarding Castelan's past unstable relationships do not provide "some evidence" of parole unsuitability.

### 4. Other Factors

Finally, the Board cited Castelan's limited programming and prison discipline citations as further bases for his parole denial. Ans. Ex. 2 at 57-58. The Board's description of Castellan's programming as "limited" is questionable. The record shows that Castelan completed 120 hours of vocational computer training and seventy-four hours in office services; earned his beginning typing certificate;

1  received numerous certificates in welding; and obtained state certification as a gas
2  metallic welder. Ans. Ex. 2 at 23-25. His welding work and certification led to
3  two job offers. Ans. Ex. 2 at 38-39. Castelan also received his GED while
4  incarcerated and is working on his high school diploma. Ans. Ex. 2 at 28, 30. He
5  completed a sixty-day workshop focusing on "the benefits of self-honesty and
6  truthfulness" and participated in Alcoholics Anonymous and Narcotics
7  Anonymous for over a year.
8        However, in light of the commitment offense, his prior criminal history, and
9  his disciplinary record, the Board reasonably concluded that Castellan still needed
10 to undertake the "necessary programming" in substance abuse, stress management,
11 and anti-gang programs in order to be suitable for release. Ans. Ex. 2 at 60-61. As
12 the Board explained, "a longer period of observation and evaluation" was
13 necessary before it could grant Castellan parole. Ans. Ex. 2 at 61.
14       The Board's related reliance on Castelan's disciplinary record bolsters the
15 finding of Castelan's current dangerousness. Ans. Ex. 2 at 57-58. The Board
16 found that Castelan had received "serious" disciplinary infractions for possession
17 of alcohol in 2002 and failure to report for assignments in 2000 and 2001. Ans.
18 Ex. 2 at 57-58, 60. Although a reviewing court might question the weight the
19 Board assigned to the violations given their minor and non-violent nature, the

1  court's "inquiry strictly is limited to whether some evidence supports the [Board's]
2  assessment . . . not whether the weight of the evidence conflicts with that
3  assessment." In re Rosenkrantz, 59 P.3d 174, 219 (Cal. 2002). Here, the Board
4  correctly found that Castelan's disciplinary gains were recent—indeed, at the time
5  of the parole hearing, Castelan had been infraction-free for only two or two and a
6  half years. When viewed in light of his prior criminal history and recidivism,
7  Castelan's recent infractions supported the Board's conclusion that he still needed
8  to demonstrate "the ability to maintain gains over an extended period of time."
9  Ans. Ex. 2 at 59. These infractions provided "some evidence" that Castelan would
10 still have difficulty abiding by the law upon release and thus pose a current danger
11 to the community. Because this factor and other factors linked the nature of
12 Castelan's commitment offense to his current dangerousness, his challenge to the
13 evidentiary basis of the parole decision is denied.

## II. WHETHER THE BOARD VIOLATED CASTELAN'S DUE PROCESS RIGHT TO A FAIR AND IMPARTIAL PANEL (Claim 1)

Castelan argues that because the members of his Board "never [before] set a parole date at an initial hearing" for a prisoner convicted for a first or second degree murder, he did "not receive a fair and impartial hearing." Pet. at 3. At his hearing, Castelan asked the Board if it had ever granted parole to such a prisoner;

the Board declined to answer, but stated that it could give Castelan a fair hearing. Ans. Ex. 2 at 9-11.

The state court rejected Castelan's claim of bias. In its view, "there [was] no showing that the previous determinations by the particular commissioners or the Board in general were not based on an individual consideration of the factors upon which suitability is to be determined." Ans. Ex. 3 at 3. The fact that the given panel never previously granted parole at the initial hearing to an inmate convicted of first or second degree murder did not establish that the panel denied parole to Castelan "on the basis of a blanket policy denying parole to all murder[ers] rather than [by] engaging in an individualized consideration of the factors." Ans. Ex. 3 at 2. Similarly, the statistics presented by Castelan—that parole had only been granted at an initial parole hearing to seventy-three inmates convicted of murder—did not show that Castelan's particular parole denial resulted from a blanket denial policy. Ans. Ex. 3 at 3.

"[D]ue process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." Schweiker v. McClure, 456 U.S. 188, 195 (1982). "Because parole boards perform tasks that are functionally comparable to those performed by the judiciary, they owe the same duty: to render impartial decisions in cases and controversies that excite strong feelings because the

16

1  litigant's liberty is at stake." O'Bremski v. Maass, 915 F.2d 418, 422 (9th Cir.
2  1990) (internal quotation marks and citations omitted); see also Morrissey v.
3  Brewer, 408 U.S. 471, 489 (1972) (holding that, for parole revocation hearings,
4  due process requires "'a neutral and detached' hearing body such as a traditional
5  parole board").

6  Castelan submitted no evidence demonstrating that the Board was biased or
7  denied his parole on the basis of a blanket policy.  While Castelan submitted a
8  declaration and news articles addressing the parole policies under the
9  administrations of Governors Wilson and Davis, Pet. Ex.s G and K,  Castelan's
10 parole hearing took place during Governor Schwarzenegger's tenure. Ans. Ex. 2 at
11 2. Nor does the statistical evidence Castelan submitted support an inference that
12 the Board decided his application based on a blanket policy. See In re
13 Rosenkrantz, 29 Cal. 4th at 685-86 (rejecting similar evidence).  As detailed in the
14 discussion of Claim 3, the Board provided Castelan with an individualized
15 assessment of his suitability for parole and found "some evidence" of his current
16 dangerousness.  Thus, the state court's rejection of Castelan's blanket policy claim
17 was neither "contrary to, or . . . an unreasonable application of, clearly established
18 Federal law," nor "an unreasonable determination of the facts in light of the
19 evidence." See 28 U.S.C. §§ 2254(d).

1  **III. WHETHER THE BOARD VIOLATED DUE PROCESS BY FAILING TO CONSIDER
2      CASTELAN'S IMMATURE STATE OF MIND AS A JUVENILE AT THE TIME OF
3      THE OFFENSE (Claim 2)**
4
5  Finally, Castelan contends that the Board violated due process by failing to
6  consider his immature state of mind at the time of the commitment offense. The
7  state court rejected Castelan's claim, concluding that "[c]ontrary to petitioner's
8  assertions, the Board also considered factors tending to indicate his suitability for
9  parole, such as his immaturity at the time of the offense . . . ." Ans. Ex. 3 at 4-5.
10 The record bears out this conclusion. For example, the Board considered a
11 letter from Castelan's home supervisor officer for the San Joaquin Juvenile system,
12 which emphasized that Castelan's age at the time of the offense. Ans. Ex. 2 at 44.
13 The Board also heard the closing statement from Castelan's attorney, which
14 repeatedly highlighted Castelan's immaturity at the time of the crime and his
15 subsequent maturation. Ans. Ex. 2 at 49-55. The Board considered Castelan's
16 extensive juvenile record, including his failure to take advantage of opportunities
17 to reform his conduct. Ans. Ex. 2 at 47-49. Finally, in its oral decision, the Board
18 explicitly noted Castelan's immaturity: "We know that you did this when you were
19 very young. But gang violence in our community just reeks[sic] havoc on the
20 community. And it's just deployable [sic]." Ans. Ex. 2 at 59-60.
21 The state court did not unreasonably apply the "some evidence" standard

when it accepted the Board's conclusion that Castelan's immaturity at the time of the commitment offense and subsequent maturation did not outweigh the evidence of his current dangerousness. Castelan does not save his claim by referring to Roper v. Simmons, 543 U.S. 551 (2005), which addressed the sentencing of juveniles, and not the due process rights involved in parole board decisions. Accordingly, Castelan's claim is denied.

## CONCLUSION

The petition for writ of habeas corpus is DENIED.

Dated: September 30, 2010

*M Margaret McKeown*
HON. M. MARGARET McKEOWN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation